**Affirmed and Memorandum Opinion filed August 10, 2023.**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00301-CV

### RAWNEY CHARLES MCVANEY, Appellant

### V.

### BAYLOR SCOTT & WHITE MEDICAL CENTER – LAKEWAY; KIRBY DALE REED, N.P.; KRISTIE LEE MILLER, M.D.; AND EPLRMC, P.A., Appellees

**On Appeal from the 353rd District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-19-001953**

## MEMORANDUM OPINION

Appellant Rawney Charles McVaney presented to the Baylor Scott & White Medical Center–Lakeway (the hospital) in Travis County with unexplained weakness and tingling in his extremities. After several hours, McVaney requested a discharge from the hospital because he believed had not received proper care and had not received a satisfactory explanation for his worsening symptoms. McVaney was later diagnosed at another area medical facility with Guillain-Barré Syndrome

(GBS), a relatively rare neurological condition.

In this appeal, we must determine whether the trial court erred in rendering summary judgment on the ground that McVaney produced no evidence of the causation required for his medical-malpractice claims against appellees the hospital, Kirby Dale Reed, N.P., Kristie Lee Miller, M.D. and EPLRMC, P.A. Concluding the trial court did not err, we affirm the judgment of the trial court.[1]

## I.    BACKGROUND

McVaney, now a 64-year-old man with a previously unremarkable medical history, woke up with tingling in his extremities and weakness in his legs on the morning of February 20, 2018. After his symptoms worsened through the morning, McVaney's wife drove him to the emergency department at the hospital around 11:30 a.m. The hospital's medical records reflect that McVaney was able to walk and stand without assistance at the time of his admission.

Despite the fact no doctor ever spoke with or physically examined McVaney, the hospital's medical records recite the following diagnoses: "R53.1 Weakness; R20.2 Paresthesia of both hands; R20.2 Paresthesia of both feet; R42 Dizziness; and Z56.6 Work Stress." McVaney's condition continued to worsen after his admission, and he became frustrated that the hospital's staff had not diagnosed or treated his condition. Nurse practitioner Kirby Dale Reed discussed the possibility of sleep apnea, suggested a sleep study, as well as an MRI for further diagnostics. McVaney requested a discharge five and a half hours after his

---

[1] The Supreme Court of Texas ordered the Court of Appeals for the Third District of Texas to transfer this appeal (No. 03-22-00132-CV) to this court. Misc. Docket No. 22-9025 (Tex. March 29, 2022); *see* Tex. Gov't Code Ann. §§ 73.001, .002. Because of the transfer, we decide the case in accordance with the precedent of the transferor court under principles of stare decisis if our decision otherwise would have been inconsistent with the transferor court's precedent. *See* Tex. R. App. 41.3.

2

admission in what McVaney described in his petition as a quadriplegic state, being unable to walk or stand.

McVaney's wife contacted a friend who was married to Dr. Richard Van Boven, a local neurologist unaffiliated with the hospital. Dr. Van Boven came to McVaney's home shortly after his discharge from the hospital, examined him, suspected he had GBS, and called an ambulance. McVaney was then transported to Seton Medical Center in Austin where he began receiving intravenous immunoglobulin treatment after medical staff at Seton suspected that he was suffering from GBS. Though the parties dispute the length of the delay in treatment, it is undisputed that McVaney began receiving treatment for his GBS less than 24 hours after the onset of his symptoms.

GBS is an acute neurological condition that generally begins with symptoms of numbness, tingling sensation in extremities, weakness, pain in the limbs or some combination of these symptoms. *See* Nobuhiro Yuki, M.D. and Hans-Peter Hartung, M.D., *Guillain-Barré Syndrome*, N. Eng. J. Med. 2012, 366:2295.[2] "The main feature is progressive bilateral and relatively symmetric weakness of the limbs, and the weakness progresses over a period of 12 hours to 28 days before a plateau is reached." *Id*. Unfortunately, the disease has a poor and often severe prognosis:

> In the majority of patients, the Guillain–Barré syndrome continues to progress for up to 1 to 3 weeks after the onset of symptoms. Two thirds of patients are unable to walk independently when maximum weakness is reached. Respiratory insufficiency occurs in 25% of patients, and major complications, including pneumonia, sepsis, pulmonary embolism, and gastrointestinal bleeding, develop in 60% of intubated patients. Among severely affected patients, 20% remain

---

[2] This article was relied on by McVaney's expert, Dr. Van Boven and attached to the expert report.

unable to walk 6 months after the onset of symptoms. The variations in the rate and extent of recovery in the Guillain–Barré syndrome make prognostication difficult.

*Id*. at 2296. Despite immunotherapy, "up to 20% of patients remain severely disabled and approximately 5% die." *Id*. at 2294.

After his admission to Seton, McVaney continued to deteriorate reaching his plateau some weeks later. Following his hospitalizations, McVaney experienced some recovery and improvement. In 2021, McVaney gave his deposition and testified he was then able to walk independently for short distances, walk with the aid of a cane for longer distances, and drive a vehicle without modifications. Though he returned to work part time, GBS has left him with physical limitations and constant pain in his legs.

In April 2019, McVaney filed a medical-malpractice claim subject to Civil Practice and Remedies Code chapter 74 against the hospital, Kristie Lee Miller, M.D., Kirby Dale Reed, N.P., and EPLRMC, P.A.[3] for failure to timely diagnose his GBS and begin appropriate treatment.[4] McVaney's petition states that this failure to diagnose and treat led to an increased severity of his GBS and resulted in "permanent paralysis resulting in permanent disability, disfigurement and [e]conomic loss." Kristie Lee Miller, M.D. was McVaney's attending physician at the hospital, who electronically signed his medical records.[5] Reed, a nurse

---

[3] EPLRMC, P.A. is the professional association which employed Dr. Kristie Miller.

[4] Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507 (popularly known as Texas Medical Liability Act (TMLA)).

[5] Dr. Miller, the attending physician, electronically signed McVaney's medical records agreeing to the following statement: "I have seen and examined the above patient." Although not pertinent to the causation issue before us, this attestation was investigated by the Texas Department of State Health Services (DSHS) after Dr. Van Boven lodged a complaint on behalf of McVaney because Dr. Miller allegedly never physically examined McVaney or spoke with him.

4

practitioner at the hospital, also signed McVaney's medical records and agreed to McVaney's treatment plan. McVaney subsequently amended his petition to add claims against all defendants for violations of the Emergency Medical Treatment & Labor Act, a federal statute. *See* 42 U.S.C. § 1395dd(a).[6]

In 2021, the defendants collectively filed a traditional and no-evidence motion for summary judgment on the issue of causation. McVaney, in response, argued that his neurology expert Dr. Van Boven established that defendants' violations of the standard of care proximately caused the increased severity of his GBS. After hearing the summary-judgment motions, the trial court granted the defendants' no-evidence motion as to McVaney's claims against the defendants. McVaney now appeals from the final judgment of the trial court.[7]

## II.    ANALYSIS

On appeal, McVaney argues that the trial court erred in rendering summary judgment because reasonable minds could differ as to whether immunotherapy treatment earlier in the day would have slowed the progression of his disease. Therefore, he asserts a fact issue precluded summary judgment.

---

[6] Popularly known as the Emergency Medical Treatment and Labor Act (EMTALA). In his petition, McVaney incorrectly cites to 42 U.S.C. §19395dd(a).

[7] The final judgment of the trial court contains the following unequivocal "finality" language:

> [T]he Defendants' No-Evidence Motion for Summary Judgment should be GRANTED as to all claims and causes of action by Plaintiff against the Defendants and that said claims and causes of action pled against the Defendants are hereby DISMISSED WITH PREJUDICE. IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that Plaintiff take nothing by this suit for his claims and causes of action against the Defendants.

*See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 192–93, 200 (Tex. 2001) ("[A] judgment issued without a conventional trial is final for purposes of appeal if and only if either it actually disposes of all claims and parties then before the court, regardless of its language, or it states with unmistakable clarity that it is a final judgment as to all claims and all parties[.]").

## A.    Applicable law

To prevail on a claim for medical negligence, a plaintiff is required to prove "(1) a duty by the healthcare provider to act according to a certain standard, (2) a breach of the applicable standard of care, (3) an injury, and (4) a sufficient causal connection between the breach of care and the injury." *Dunnick v. Marsillo*, 654 S.W.3d 224, 228 (Tex. App.—Austin 2022, pet. granted); *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.004(a)(13); *see also Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019) ("To prevail in a wrongful-death suit alleging medical malpractice, a plaintiff must establish the elements of negligence.").

A claimant bringing a medical-negligence claim must serve each defendant against whom a liability claim is asserted with one or more expert reports. *See* Tex. Civ. Prac. & Rem. Code § 74.351(a). The expert must explain the basis of his statements to link his conclusions to the facts. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017); *HMIH Cedar Crest, LLC v. Buentello*, No. 03-20-00377-CV, 2022 WL 627226, at *6 (Tex. App.—Austin Mar. 4, 2022, no pet.).

## B.    Standard of review

Although the defendants filed a combined traditional and no-evidence summary judgment motion, the trial court granted only the no-evidence motion. Therefore, we consider only the standards applicable to no-evidence motions.

A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). "After adequate time for discovery, a party without presenting summary judgment evidence may move for

summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which the [nonmovant] would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). Once the motion is filed, the burden shifts to the nonmovant to produce summary-judgment evidence raising a genuine issue of material fact on the challenged element. *See B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020). A trial court properly grants a no-evidence summary-judgment motion if the nonmovant produces no more than a scintilla of probative evidence—that is, if the nonmovant's evidence does not rise to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018).

## C.    The expert report

Plaintiff produced an expert report from Dr. Van Boven, dated March 27, 2019, describing how defendants deviated from the appropriate standard of care by not properly screening and examining McVaney. These failures resulted in the hospital's failure to appropriately diagnose McVaney and provide the necessary and standard treatment for GBS. Dr. Van Boven opined that these violations in the standard of care had a "significant deleterious effect [on] the patient's long-term outcome."

Specifically addressing causation, Dr. Van Boven explains that the hospital greatly increased McVaney's chances for a poor outcome by delaying the administration of immunotherapy:

> Weakness at hospital admission has been recently found to be a main predictor of long-term outcomes in patients with GBS. In the largest study of its kind of prognostic indicators, nearly 400 patients with GBS followed prospectively, Walgaard et al. found that weakness at hospital admission, as measured and quantified by the Medical

Research Council ("MRC") sumscore, is a major predictor of poor prognosis, i.e. being unable to walk independently, at 4 weeks and 6 months, the latter being a time-frame wherein a plateau in recovery may reasonably be expected.

These data are of relevance to the case of Mr. McVaney. His risk of poor outcome was predicted to have more than doubled by the delay in treatment caused by [the hospital's] violations in the standard of care. Comparison of his MRC sumscore at initial hospital presentation at Baylor Scott & White-Lakeway versus his sumscore upon admission at Seton Main not only boded poorly, but has been brought to fruition.

More than one year after the delayed diagnosis and delayed treatment of GBS, Mr. McVaney remains wheel-chair or walker dependent. The consequences of failure to timely treat GBS parallels the sequela of failure to treat other acute, monophasic attacks, e.g. stroke, traumatic brain injury, or heart attacks. []

Based on these and previous studies, I maintain that the delay in acute treatment (IV Immunoglobulin) for GBS resultant from Defendants' breaches in the standards of care contributed significantly and negatively to Mr. McVaney's long-term outcome.[8]

In his report, Dr. Van Boven cites three medical journal articles, two of which were included with his expert report. Although Dr. Van Boven supplemented his expert report, his opinion on causation and the basis for his opinion remained unchanged.

## D.    The trial court's judgment

The defendants' summary-judgment motion discusses the standards for admissibility of evidence under Rule 702 and asks the trial court to exclude Dr. Van Boven's opinion because his opinions are not reliable and inadmissible for establishing causation.[9] The defendants also filed, on the same day, a

---

[8] The footnotes in Dr. Van Boven's report have been omitted.

[9] The record before this court does not reflect that any *Daubert/Robinson* motions to exclude were filed or considered by the trial court. *See E.I. du Pont de Nemours & Co., Inc. v.*

8

*Daubert/Robinson* motion to exclude the opinion of Dr. Van Boven. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995) (trial court determines whether expert's opinion is based on reliable methods and research).

The trial court reviewed Dr. Van Boven's opinions by performing its own analysis of the medical literature relied on by Dr. Van Boven.[10, 11] Ultimately, the trial court concluded that McVaney did not provide evidence that the delay in treatment contributed to his injuries. Although the trial court's judgment appears to encompass both a summary-judgment analysis as well as a Rule 702 analysis, the trial court never made a ruling in the record excluding or striking the opinions of Dr. Van Boven.

This court has previously concluded that a similar ruling from a trial court constituted an implied ruling. *See Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 242 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("The trial court, in holding that [plaintiff] had failed to present 'legally competent evidence,' effectively concluded that the expert testimony was either inadmissible or insufficient."). The Austin Court of Appeals has also held that a no-evidence summary judgment is proper if the only evidence offered by the nonmovant to prove an essential element of the claim cannot be given weight by the court. *See Jacob v. Int'l Cellulose Corp., Inc.*,

---

*Robinson*, 923 S.W.2d 549, 558 (Tex. 1995) (trial court determines whether expert's opinion is based on reliable methods and research).

[10] While judges act as gatekeepers in determining the admissibility of evidence, judges are not scientists or doctors and do not decide whether an opinion is correct. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998) ("The trial court is not to determine whether an expert's conclusions are correct, but only whether the analysis used to reach them is reliable.").

[11] The trial court's final judgment is six pages long and is in effect a four-page opinion combined with a two-page judgment. For purposes of our review, we only consider the portion of the writing that constitutes the judgment.

No. 03-06-00210-CV, 2007 WL 1237963, at *4 (Tex. App.—Austin Apr. 27, 2007, no pet.) (citing with approval *Praytor*, 97 S.W.3d at 240).

Here, the evidence supporting McVaney's causation argument was an affidavit from Dr. Van Boven and Dr. Van Boven's expert report. Given that the trial court concluded that it had not been provided with sufficient evidence that any delay in treatment contributed to McVaney's injuries, the trial court effectively addressed the competency of the expert opinions.

### E.    Causation

Proximate cause is an essential element of a medical-negligence claim and consists of (1) cause in fact and (2) foreseeability. *Windrum*, 581 S.W.3d at 777 (citing *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). Foreseeability requires only that the defendants should have anticipated that their negligent acts or omissions would create danger or harm for others; it does not require the defendants to have actually anticipated the precise manner in which the injury would have occurred. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). To establish cause in fact, the plaintiff must show by a preponderance of the evidence that the defendant's negligent conduct "was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Bustamante*, 529 S.W.3d at 456 (citation omitted). Consequently, the plaintiff must "adduce evidence of a 'reasonable medical probability' or 'reasonable probability'" that the defendant's negligence caused the plaintiff's injury—that is, it must be "'more likely than not' that the ultimate harm or condition resulted from such negligence." *Id*. (quoting *Jelinek v. Casas*, 328 S.W.3d 526. 532–33 (Tex. 2010)).

The progression and treatment of GBS is not within the common knowledge and experience of jurors, and therefore requires expert testimony to establish

causation. *See JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015). "A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224 (Tex. 2018). In addition, "when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion." *Jelinek*, 328 S.W.3d at 536.

The specific causation question in this case is whether the delay in immunotherapy treatment due to defendants' failure to diagnose McVaney's GBS while he was at the hospital caused McVaney's GBS to progress faster and/or with more severity than it would have with more rapid treatment.

## F. Did the trial court err?

### 1. Arguments of the parties

In their no-evidence motion, the defendants argued that Dr. Van Boven's opinions "provide no evidence which establishes proximate cause between any alleged negligence attributable to Defendants and the injuries sustained by Plaintiff and or the compensable damages sought by the Plaintiff." They also highlight that Dr. Van Boven never discussed or explained the medical literature on which he relied. Then analyzing the medical literature on which Dr. Van Boven specifically bases his opinion, defendants conclude that Dr. Van Boven's opinion is not reliable because the medical literature does not support or corroborate his opinion.

In response, McVaney argued that Dr. Van Boven's opinion was reliable and was based on peer-reviewed medical literature. McVaney countered defendants' argument that the medical literature did not support Dr. Van Boven's opinion and asserted that it "is naive to assert/assume that because there is not a study showing

the results of treatment delay at exact particular points in time there is no evidence of causation when clearly there is evidence that immediate treatment prior to deterioration nearly doubled the improved prognosis."

## 2. Dr. Van Boven's opinions

Dr. Van Boven's report extensively addresses the hospital's breach of the standard of care, which was not challenged by the hospital on summary judgment. With respect to causation, Dr. Van Boven ultimately concludes in his report that "the delay in acute treatment (IV Immunoglobulin) for GBS resultant from Defendants' breaches in the standards of care contributed significantly and negatively to Mr. McVaney's long-term outcome." However, an expert must explain the basis of his statements and link his conclusions to specific facts. *See Abshire*, 563 S.W.3d at 224.

Dr. Van Boven begins his causation discussion by stating that weakness at hospital admission, "as measured and quantified by the Medical Research Council ("MRC") sumscore," is found to be a main predictor of poor prognosis.[12] Dr. Van Boven never provided McVaney's sumscore at the time of his admission to the hospital, nor does he discuss McVaney's sumscore at any later point in time. Dr. Van Boven's expert report offers no insight into how a sumscore is calculated or whether or when it was calculated for McVaney. It is also unknown whether McVaney's sumscore was calculated by his medical providers and contained within his medical records or whether it is a measure calculated after the fact.

In his affidavit, Dr. Van Boven quantifies the delay in treatment as "nearly 12 hours delay." But, despite this case turning on a delay in medical treatment, Dr.

---

[12] The quote is attributed to a Dutch study heavily relied on by Dr. Van Boven. *See* C. Walgaard, H.F. Lingsma, L. Ruts, P.A. van Doorn, E.W. Steyerberg & B.C. Jacobs, *Early Recognition of Poor Prognosis In Guillain-Barré Syndrome*, NEUROLOGY, 76:968-975 (2011).

Van Boven offered no opinion or discussion regarding the appropriate window of opportunity for treatment, consistent with the standard of care, in which GBS should have been diagnosed to avoid more serious illness. Instead, Dr. Van Boven cited to a study that followed 400 patients with GBS and concluded that weakness at hospital admission is a major predictor of poor prognosis. It is undisputed that when McVaney presented to the hospital he was already experiencing weakness, difficulty walking, and tingling in his extremities. Although the record makes clear that McVaney's condition worsened throughout the day, Dr. Van Boven's report and affidavit do not discuss whether the research on which he relies establish the consequences of a delay in treatment. Rather, his conclusions assume without explanation that the research in the Walgaard study is applicable to the causation issue before us.[13]

Although Dr. Van Boven attached the journal articles on which he relies to his report, Dr. Van Boven does not explain or discuss how he used the research to reach his ultimate conclusion. Without delving into the substance of the underlying medical literature on which he relies, the factfinder is left with only Dr. Van Boven's ultimate conclusions.

### 3. Dr. Van Boven's conclusory statements are not evidence of causation

To support a claim that a delayed diagnosis allowed the patient's medical condition to worsen or disease to progress, an expert must explain how and why the facts support this conclusion. For example, in *Naderi v. Ratnarajah*, a dentist failed to diagnose and treat an infected tooth abscess, causing the patient to lose part of his lower jaw. 572 S.W.3d 773, 776 (Tex. App.—Houston [14th Dist.] 2019, no pet.). The expert explained that the abscess was "clearly visible" on a

---

[13] Dr. Van Boven's expert report expressly states that his causation opinion is "[b]ased on these and previous studies."

radiograph taken at the initial visit, and that the radiograph showed the infection from the tooth spreading into the surrounding bone, but the dentist did not extract the tooth or prescribe antibiotics. *Id*. at 775, 776–77. Seven months later, the patient additionally suffered from swelling and inflammation inside his mouth, and still the dentist took no action. *Id*. at 775–76. The expert in *Naderi* supported his causation opinion by describing how medical records documented the appearance of additional symptoms over time.

By contrast, in *Baylor College of Medicine v. Davies*, a gynecologist failed to diagnose and begin treatment for ovarian cancer, which the plaintiff claimed led to significant progression of the cancer resulting in a worse prognosis and reduced life expectancy. 599 S.W.3d 323, 326–27 (Tex. App.—Houston [14th Dist.] 2020, no pet.). However, the initial finding in the laboratory report stated that the plaintiff might have a tumor but did not reflect the stage of the tumor. *Id*. at 330. The plaintiff's expert concluded the tumor, at the time of the first pathology report was a stage 1 tumor, but offered no explanation of how he reached that conclusion based on the information in the pathology report. *Id*. For these reasons, we held that the plaintiff's expert report was conclusory because it was only supported by *ipse dixit*. *Id*. at 326.

McVaney cites the supreme court's opinion in *Bustamante v. Ponte* as instructive and controlling because it involved the question of whether an expert's reliance on a specific medical study could be used to determine whether a delay in treatment of a retinal disorder caused an infant's loss of vision. *Bustamante*, 529 S.W.3d at 462. McVaney primarily relies on the *Bustamante* case to rebut the defendants' argument that the underlying medical studies do not support Dr. Van Boven's opinion (i.e., an "analytical gap"). However, the court's analysis of the medical study in *Bustamante* is not instructive to the question we must answer in

14

this appeal. While the parties in *Bustamante* argued over the applicability of a certain study to the situation of the infant injured in that case, the causation experts in *Bustamante* relied on multiple studies, and "offered the bases for their opinions." *Id*. at 459–60, 462. We agree with McVaney that the law does not require Dr. Van Boven to rely on more than one study to establish the reliability of his opinions. We also agree with McVaney that the law does not require that the study relied on by Dr. Van Boven align perfectly with the factual or medical situation at issue in the case. But the law does require Dr. Van Boven to give the bases for his opinion and explain his opinion. *See Bustamante*, 529 S.W.3d at 462 (opinion is conclusory if stated basis for opinion provides no support); *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 806 (Tex. 2006) (expert opinion is "fundamentally unsupported" when only link between expert's conclusion and underlying facts is expert's "own say-so").

Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more or less probable." *See* Tex. R. Evid. 401. It may be, as McVaney argues in his appellate brief, that Dr. Van Boven "logically deduced" his opinion from the findings of the Walgaard study. But because Dr. Van Boven never explained how he logically deduced his opinion nor did he link his opinion to specific facts, his opinions in this case are not competent evidence. *See Abshire*, 563 S.W.3d at 224; *Coastal Transp. Co. v. Crown Central Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (citations omitted).

We therefore conclude the trial court did not err in granting the defendants' no-evidence summary judgment motion and overrule McVaney's sole issue on appeal.

### III. CONCLUSION

We affirm the judgment of the trial court as challenged on appeal.


/s/     Charles A. Spain
        Justice

Panel consists of Chief Justice Christopher and Justices Jewell and Spain.